# Exhibit A

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 2 of 62 PageID #: 26

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

------------------------------------------------------------------X

DONALD DEGREGORIS, GUY DENIGRIS, THERESA EMERICK, FAITH FRASCA, RENA GOTOWNER, JANET PRO, individually and on behalf of the Estate of SUSAN MARTINO, JEANNE LAROSA, individually and on behalf of the Estate of CAROL MURPHY, KENNETH PETERS, ALAN ROSENBERG, and SHERI ZBAR,

_Plaintiffs,_

-against -

NORTHROP GRUMMAN CORPORATION and NORTHROP GRUMMAN SYSTEMS CORPORATION

_Defendants._

------------------------------------------------------------------X

Index No. _____

**SUMMONS**

Trial by jury is requested

Venue is proper in Nassau County pursuant to CPLR §§ 503(a), 503(c) and 507 – Plaintiffs' place of residence, location where the claims arose, and location of the real property affected.

TO THE ABOVE-NAMED DEFENDANTS:

You are hereby summoned and required to serve upon the Plaintiffs' attorneys an answer to the Verified Complaint in this action within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the Verified Complaint.

Dated: Melville, New York
February 17, 2022

NAPOLI SHKOLNIK
_Attorneys for Plaintiffs_

_____
Lilia Factor, Esq.
400 Broadhollow Rd., Suite 305
Melville, New York 11747
(212) 397-1000

Case 2:22-cv-01432-GRB-AYS   Document 1-1   Filed 03/15/22   Page 3 of 62 PageID #:
27

Paul Napoli, Esq.
270 Munoz Rivera Avenue, Ste. 201
Hato Rey, Puerto Rico 00918

--------

ENVIRONMENTAL LITIGATION GROUP, P.C.
*Attorneys for Plaintiffs*
2160 Highland Avenue South
Birmingham, AL 35205
(205) 328-9200


To:
NORTHROP GRUMMAN
CORPORATION and
NORTHROP GRUMMAN SYSTEMS
CORPORATION

c/o MORRISON & FOERSTER LLP
*Attorneys for Defendants*
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000

2

Case 2:22-cv-01432-GRB-AYS   Document 1-1   Filed 03/15/22   Page 4 of 62 PageID #:
28

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-------------------------------------------------------------------X

DONALD DEGREGORIS, GUY DENIGRIS, THERESA
EMERICK, FAITH FRASCA, RENA GOTOWNER,
JANET PRO, individually and on behalf of the Estate of
SUSAN MARTINO, JEANNE LAROSA, individually
and on behalf of the Estate of CAROL MURPHY,
KENNETH PETERS, ALAN ROSENBERG, and SHERI
ZBAR,

*Plaintiffs,*

-against -

NORTHROP GRUMMAN CORPORATION and
NORTHROP GRUMMAN SYSTEMS CORPORATION,

*Defendants.*

-------------------------------------------------------------------X

Index No. _____

**VERIFIED COMPLAINT**

The above named Plaintiffs ("Plaintiffs"), through their attorneys, Napoli Shkolnik PLLC
and Environmental Litigation Group, P.C., complaining of NORTHROP GRUMMAN
CORPORATION and NORTHROP GRUMMAN SYSTEMS CORPORATION ("Defendants"),
as and for their Verified Complaint, hereby allege as follows:

## INTRODUCTION

1.  Plaintiffs are all individuals who are current or former residents and/or property owners
in or around Bethpage, New York, and nearby communities located within the Town of Oyster
Bay and the Town of Hempstead in Nassau County ("Bethpage area").

2.  Plaintiffs reside or resided in the vicinity of the area formerly known as the Grumman
Aerospace-Bethpage Facility Site, including the Northrop Grumman – Bethpage Facility, the
Naval Weapons Industrial Reserve Plant – Bethpage ("NWIRP"), and the Grumman Steel Los
Site.

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 5 of 62 PageID #: 29

3. Many of the toxic waste products used in the operations at the above facilities were disposed of by the Defendants on site, including on an adjacent parcel, which was later donated by Grumman to the Town of Oyster Bay and became known as Bethpage Community Park ("Park").

4. Collectively, the Grumman-Navy facilities consisting of approximately 635 acres in Nassau County, including the Grumman Aerospace-Bethpage Facility Site, the Northrop Grumman – Bethpage Facility, NWIRP, the Grumman Steel Los Site and the Park shall be referred to as the "Site".

5. Upon information and belief, Grumman Aeronautical Engineering was incorporated in New York in 1929 and changed its name to "Grumman Corporation" in 1969. Grumman Corporation's headquarters were in Bethpage, New York. Grumman Aerospace Corporation was a subsidiary of Grumman Corporation, with its principal place of business in Bethpage, New York. Collectively, Grumman Corporation and Grumman Aerospace Corporation are referred to herein as "Grumman."

6. In 1994, Grumman was acquired by Northrop Corporation. The two companies merged in 1995 to become Northrop Grumman Corporation.

7. During several decades while it operated at the Site, Grumman, an airplane, weapons and satellite manufacturer with significant U.S. Department of Defense contracts, generated, stored, and disposed of toxic contaminants and manufacturing byproducts, including, but not limited to, volatile organic compounds ("VOCs") including trichloroethylene ("TCE"), semi-volatile organic compounds (SVOCs), metals including hexavalent chromium, polychlorinated biphenyls ("PCBs"), aromatic hydrocarbons, radioactive materials, 1,4-Dioxane, per- and polyfluoroalkyl substances ("PFAS"), and other waste products at the Site. Collectively, these substances shall be referred to herein as Contaminants.

2

8.    Grumman's practices, toxic air emissions, discharges and dumping of Contaminants resulted in extensive pollution at the Site and contaminated off-Site soils, air, groundwater and drinking water supplies in the area, causing Plaintiffs' injuries.

9.    Toxic air emissions from Grumman's industrial operations polluted the air in the surrounding area for decades.    Specifically, large amounts of hexavalent chromium and Trichloroethylene ("TCE") and other pollutants were discharged into the air from the facilities.

10.    In addition, due to the negligent, willful, and/or wanton actions of the Defendants, large quantities of Contaminants were released at the Site and created massive migrating plumes of contaminated groundwater.

11.    These plumes, designated by the New York State Department of Environmental Conservation ("DEC") as Operable Unit 2 ("OU-2") and Operable Unit 3 ("OU-3"), have resulted in the migration of the Contaminants onto Plaintiffs' properties.

12.    The contamination of groundwater also severely impacted the drinking water supplies of several of the neighboring communities, which rely entirely on Long Island's sole source aquifer.

13.    Furthermore, heavily contaminated soil in and around Bethpage Community Park led to direct toxic exposure for generations of residents who used the Park's facilities.

14.    Contaminants from the Site also caused pollution of soil and soil vapor intrusion at residential properties and neighborhood schools.

15.    As a result of their exposure to the Contaminants originating at the Site, Plaintiffs have and continue to suffer injuries, including significant health impairments and future health concerns.

16.    In or about September 2016, a class action complaint was filed in this Court against the above Defendants and the Town of Oyster Bay under Index No. 607036/16 ("class action").    The class action, which is now pending in the U.S. District Court for the Eastern District of New York,

3

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 7 of 62 PageID #:
31

was filed on behalf of Bethpage area residents and/or homeowners whose properties and person have been adversely impacted by the above contamination.

17. The class action seeks damages for the plaintiffs' and putative class members' past and continued exposure to toxic contaminants, the loss of use and diminution of value of plaintiffs' properties, loss of quality of life and medical monitoring, as well as punitive damages.

18. The instant action states individual claims for personal injury and other damages based on the same causes of action, namely, negligence, strict liability for abnormally dangerous activity, private nuisance and trespass.

## JURISDICTION

19. This Court has personal jurisdiction over the Defendants, as each of them is doing business in New York and owns property in New York, such that it is reasonably foreseeable that they would be subject to the jurisdiction of the courts of this state.

20. This Court has subject matter jurisdiction in this action based on the claims herein, which are all based on New York law and the local nature of this case.

## VENUE

21. This case is properly venued in this Court, pursuant to CPLR §503(a), because most of the Plaintiffs reside in Nassau County.

22. This case is properly venued in this Court, pursuant to CPLR §503(c). Specifically, Defendants and/or their predecessors and/or successors own/ed and/or operated the Site at the time of the disposal and/or release and/or failure to remediate the impacts of hazardous and toxic substances, causing Plaintiffs' injuries in this County.

23. This case is properly venued in this Court, pursuant to CPLR §507, because Defendants' actions and omissions have and continue to affect the use and enjoyment of Plaintiffs' real property in this County.

4

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 8 of 62 PageID #:
32

## THE PARTIES: PLAINTIFFS

24.     The Plaintiffs are current or former residents and/or current property owners in the Bethpage area in the vicinity of the Site and/or the contaminated groundwater plumes emanating from the Site.

25.     Many of the Plaintiffs have and/or continue to visit and use the Park for recreation.

26.     The Plaintiffs' causes of action related to soil, water, air contamination and toxic exposure are continuing in nature.

27.     The hazardous and toxic substances described herein are environmental contaminants as set out in Section 6.8.1 of the ATSDR Public Health Assessment Guidance Manual.  Plaintiffs are an 'exposed population' as defined therein:

A population is considered exposed if a completed exposure pathway, which links a contaminant with a receptor population, exists in the past, present, or future. An exposed population includes persons who ingest, inhale, or contact site contaminants or are exposed to radiation in the past, present, or future. Examples of exposed persons include those who:

• *have ingested, are ingesting, or will ingest the contaminant from one or more environmental media;*
• *have inhaled, are inhaling, or will inhale the contaminant from one or more environmental media;*
• *have contacted, are contacting, or will contact the contaminant in one or more environmental media; and*
• *were exposed, are exposed, or will be exposed to gamma radiation from one or more environmental media.*

*If an environmental medium (soil) contains a contaminant of concern at a point of exposure (a residential yard), and evidence already exists that a route of exposure (ingestion) has occurred, is occurring, or will occur, the health assessor should assume that persons living at that residence are exposed or will be exposed. If the residential yard contains a vacant house, the health assessor should assume that future residents will be exposed. Persons should also be considered exposed if exposure has been verified by human biologic measurements or medical examination. For health assessments, human biologic measurements or medical examination are not necessary for the assignment of an exposure category to a population.*

5

28.    Defendants' conduct was grossly negligent, intentional, conscious, and was undertaken with callous and malicious disregard for the health, well-being and safety of Plaintiffs and others.

29.    As a consequence of the foregoing misconduct on the part of Defendants, each of the Plaintiffs sustained and with reasonable probability will in the future sustain the following injuries and/or damages:

a.  physical pain and suffering;

b.  physical disabilities;

c.  mental anguish;

d.  loss of the enjoyment of life's pleasures;

c.  inability to participate in his/her usual employment and activities;

f.  lost income and lost earning opportunities;

g.  medical expenses (past and future);

h.  economic loss;

i.  loss of companionship, services and support (for decedent estate representatives)

j.  and was otherwise damaged.

30.    In addition, Plaintiffs who are current homeowners in the vicinity of the Site and the contaminated groundwater plumes have and will continue to sustain property damages including, but not limited to the difference between the current value of their property and such value if the harm had not been done, stigma damages, private nuisance, trespass and the cost of repair or restoration.

31.    Each of the Plaintiffs brings suit against each of the Defendants for each cause of action listed herein and seeks general damages directly and foreseeably resulting from Defendants'

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 10 of 62 PageID #: 34

actions, as well as nominal, consequential damages, and punitive damages, as allowed by law and in an amount to be proved at trial.

32.     The amounts of damages sought herein exceed the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

### *Facts and Claims Relating to Individual Plaintiffs*

33.     Plaintiff, **Donald DeGregoris** currently resides at 1485 Round Swamp Rd., Old Bethpage, NY 11804.

34.     For one or more years prior to 1995, this Plaintiff resided at 44 Cedar Ave., Bethpage, 11714 ("property").

35.     The property is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

36.     During Grumman's operations, residents at the property, including this Plaintiff, were exposed to toxic air emissions from the Site.

37.     As a result of Defendants' negligence in the manufacturing process and processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

38.     This Plaintiff was exposed to the Contaminants at the property, the neighborhood, including the Park, and other areas at or near the Site, through inhalation of air pollutants, ingestion and direct dermal contact with surface and subsurface soil and contaminated water.

39.     As a result of the toxic exposures described above, this Plaintiff has developed significant debilitating personal injuries, including but not limited to the injuries set forth below.

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 11 of 62 PageID #: 35

40.     In or around 2013, Donald DeGregoris was diagnosed with **Kidney Cancer,** a condition caused or contributed to by the Contaminants**.**

41.     As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain, and suffering.

42.     Plaintiff, **Guy Denigris** currently owns the property and resides at 19 Belmont Ave., Plainview, NY 11803 ("property"). He resided there for one or more years prior to 1995.

43.     The property is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

44.     During Grumman's operations, residents at the property, including this Plaintiff, were exposed to toxic air emissions from the Site.

45.     As a result of Defendants' negligence in the manufacturing process and processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

46.     This Plaintiff was exposed to the Contaminants at the property, the neighborhood, including the Park, and other areas at or near the Site, through inhalation of air pollutants, ingestion and direct dermal contact with surface and subsurface soil and contaminated water.

47.     As a result of the toxic exposures described above, this Plaintiff has developed significant debilitating personal injuries, including but not limited to the injuries set forth below.

48.     In or around 2018, Guy Denigris was diagnosed with **Tonsillar Cancer,** a condition caused or contributed to by the Contaminants**.**

49.     As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain, and suffering.

INDEX NO. 602063/2022
RECEIVED NYSCEF: 02/17/2022

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 12 of 62 PageID #: 36

50.     Plaintiff, **Theresa Emerick** currently resides at 2205 Manor Lane, Massapequa, NY 11758.

51.     For one or more years prior to 1995, this Plaintiff resided at 21 Manchester Dr., Bethpage, NY 11714 ("property").

52.     The property is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

53.     During Grumman's operations, residents at the property, including this Plaintiff, were exposed to toxic air emissions from the Site.

54.     As a result of Defendants' negligence in the manufacturing process and processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

55.     This Plaintiff was exposed to the Contaminants at the property, the neighborhood, including the Park, and other areas at or near the Site, through inhalation of air pollutants, ingestion and direct dermal contact with surface and subsurface soil and contaminated water.

56.     As a result of the toxic exposures described above, this Plaintiff has developed significant debilitating personal injuries, including but not limited to the injuries set forth below.

57.     In or around 1997, Theresa Emerick was diagnosed with **Non-Hodgkins Lymphoma,** a condition caused or contributed to by the Contaminants**.**

58.     As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain, and suffering.

59.     Plaintiff, **Faith Frasca** currently owns the property and resides at 9 George Avenue, Hicksville, NY 11801 ("property"). She resided there for one or more years prior to 1995.

9

60.     The property is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

61.     During Grumman's operations, residents at the property, including this Plaintiff, were exposed to toxic air emissions from the Site.

62.     As a result of Defendants' negligence in the manufacturing process and processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

63.     This Plaintiff was exposed to the Contaminants at the property, the neighborhood, including the Park, and other areas at or near the Site, through inhalation of air pollutants, ingestion and direct dermal contact with surface and subsurface soil and contaminated water.

64.     As a result of the toxic exposures described above, this Plaintiff has developed significant debilitating personal injuries, including but not limited to the injuries set forth below.

65.     In or around 2005, Faith Frasca was diagnosed with **Lung Cancer,** a condition caused or contributed to by the Contaminants**.**

66.     As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain, and suffering.

67.     Plaintiff, **Rena Gotowner** currently owns the property and resides at 24 Robert St., Old Bethpage, NY 11804.

68.     For one or more years prior to 1995, this Plaintiff resided at 16 Evelyn Dr., Bethpage, NY 11714 ("property").

69.     The property is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

Case 2:22-cv-01432-GRB-AYS Document 1-1 Filed 03/15/22 Page 14 of 62 PageID #: 38

70. During Grumman's operations, residents at the property, including this Plaintiff, were exposed to toxic air emissions from the Site.

71. As a result of Defendants' negligence in the manufacturing process and processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

72. This Plaintiff was exposed to the Contaminants at the properties, the neighborhood, including the Park, and other areas at or near the Site, through inhalation of air pollutants, ingestion and direct dermal contact with surface and subsurface soil and contaminated water.

73. As a result of the toxic exposures described above, this Plaintiff has developed significant debilitating personal injuries, including but not limited to the injuries set forth below.

74. In or around 2009, Rena Gotowner was diagnosed with **Breast Cancer,** a condition caused or contributed to by the Contaminants**.**

75. As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain, and suffering.

76. Plaintiff, **Janet Pro, individually and on behalf of the Estate of Susan Martino,** currently resides at 285 Red Barn Road, Newport, NC 28570.

77. For one or more years prior to 1995, Susan Martino resided at 104 South 4th Street, Bethpage, NY 11714 ("property").

78. The property is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

79. During Grumman's operations, residents at the property, including decedent Susan Martino, were exposed to toxic air emissions from the Site.

11

Case 2:22-cv-01432-GRB-AYS          Document 1-1          Filed 03/15/22          Page 15 of 62 PageID #: 39

80. As a result of Defendants' negligence in the manufacturing process and processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including the property.

81. Susan Martino was exposed to the Contaminants at the property, the neighborhood, including the Park, and other areas at or near the Site, through inhalation of air pollutants, ingestion and direct dermal contact with surface and subsurface soil and contaminated water.

82. As a result of the toxic exposures described above, Susan Martino developed significant debilitating personal injuries, including but not limited to the injuries set forth below.

83. In or around 1978, **Susan Martino** was diagnosed with **Tongue Cancer,** a condition caused or contributed to by the Contaminants**.**

84. In or around 1990, **Susan Martino** was diagnosed with **Breast Cancer,** a condition caused or contributed to by the Contaminants**.**

85. In or around 2004, **Susan Martino** was diagnosed with **Throat Cancer,** a condition caused or contributed to by the Contaminants**.**

86. Susan Martino passed away from her injuries on December 19, 2020.

87. Janet Pro, on behalf of the Estate of Susan Martino, brings this claim for wrongful death caused by the Defendants.

88. In addition, Janet Pro, individually has sustained a loss of companionship, services and support as a resulting from Defendants' actions which resulted in the death of her mother, Susan Martino.

89. Plaintiff, **Jeanne LaRosa, individually and on behalf of the Estate of Carol Murphy,** currently resides at 28 Hayden Drive, Bethpage, NY 11714.

12

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 16 of 62 PageID #: 40

90.     For one or more years prior to 1995, Carol Murphy resided at 28 Hayden Drive, Bethpage, NY 11714 ("property").

91.     The property is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

92.     During Grumman's operations, residents at the property, including decedent Carol Murphy, were exposed to toxic air emissions from the Site.

93.     As a result of Defendants' negligence in the manufacturing process and processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including the property.

94.     Carol Murphy was exposed to the Contaminants at the property, the neighborhood, including the Park, and other areas at or near the Site, through inhalation of air pollutants, ingestion and direct dermal contact with surface and subsurface soil and contaminated water.

95.     As a result of the toxic exposures described above, Carol Murphy developed significant debilitating personal injuries, including but not limited to the injuries set forth below.

96.     In or around 2007, **Carol Murphy** was diagnosed with **Breast Cancer,** a condition caused or contributed to by the Contaminants**.**

97.     Carol Murphy passed away from her injuries on May 8, 2020.

98.     Jeanne LaRosa, on behalf of the Estate of Carol Murphy, brings this claim for wrongful death caused by the Defendants.

99.     In addition, Jeanne LaRosa, individually has sustained a loss of companionship, services and support as a resulting from Defendants' actions which resulted in the death of her mother, Carol Murphy.

13

Case 2:22-cv-01432-GRB-AYS   Document 1-1   Filed 03/15/22   Page 17 of 62 PageID #: 41

100.    Plaintiff, **Kenneth Peters** currently owns the property and resides at 24 Ruth Place Plainview, NY 11803. For one or more years prior to 1995, this Plaintiff resided at 8 Spruce Avenue, Bethpage, NY 11714 (collectively, "properties").

101.    The properties are located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

102.    During Grumman's operations, residents at the properties, including this Plaintiff, while residing at 8 Spruce Avenue, were exposed to toxic air emissions from the Site.

103.    As a result of Defendants' negligence in the manufacturing process and processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residences.

104.    This Plaintiff was exposed to the Contaminants at the properties, the neighborhood, including the Park, and other areas at or near the Site, through inhalation of air pollutants, ingestion and direct dermal contact with surface and subsurface soil and contaminated water.

105.    As a result of the toxic exposures described above, this Plaintiff has developed significant debilitating personal injuries, including but not limited to the injuries set forth below.

106.    In or around 1982, Kenneth Peters was diagnosed with **Lung Cancer,** a condition caused or contributed to by the Contaminants**.**

107.    As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain, and suffering.

108.    Plaintiff, **Alan Rosenberg** currently owns the property and resides at 7 Sherman Ave., Plainview, NY 11803 ("property"). He resided there for one or more years prior to 1995.

14

Case 2:22-cv-01432-GRB-AYS     Document 1-1     Filed 03/15/22     Page 18 of 62 PageID #: 42

109.    The property is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

110.    During Grumman's operations, residents at the property, including this Plaintiff, were exposed to toxic air emissions from the Site.

111.    As a result of Defendants' negligence in the manufacturing process and processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

112.    This Plaintiff was exposed to the Contaminants at the property, the neighborhood, including the Park, and other areas at or near the Site, through inhalation of air pollutants, ingestion and direct dermal contact with surface and subsurface soil and contaminated water.

113.    As a result of the toxic exposures described above, this Plaintiff has developed significant debilitating personal injuries, including but not limited to the injuries set forth below.

114.    In or around 2013, Alan Rosenberg was diagnosed with **male Breast Cancer,** a condition caused or contributed to by the Contaminants**.**

115.    As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain, and suffering.

116.    Plaintiff, **Sheri Zbar** currently resides at 384 Hunter Ave., West Islip, NY 11795.

117.    For one or more years prior to 1995, this Plaintiff resided at 116 Evergreen Ave., Bethpage, NY 11714 ("property").

118.    The property is located in the vicinity of the Site and/or the contaminated groundwater plumes migrating from the Site.

15

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 19 of 62 PageID #: 43

119.   During Grumman's operations, residents at the property, including this Plaintiff, were exposed to toxic air emissions from the Site.

120.   As a result of Defendants' negligence in the manufacturing process and processing, distribution, transporting, storing, handling and/or disposing of toxic and/or hazardous substances at the Site, Contaminants were discharged into the soil, air and groundwater at the Site and the surrounding area, including Plaintiff's residence.

121.   This Plaintiff was exposed to the Contaminants at the property, the neighborhood, including the Park, and other areas at or near the Site, through inhalation of air pollutants, ingestion and direct dermal contact with surface and subsurface soil and contaminated water.

122.   As a result of the toxic exposures described above, this Plaintiff has developed significant debilitating personal injuries, including but not limited to the injuries set forth below.

123.   In or around 2018, Sheri Zbar was diagnosed with **Breast Cancer,** a condition caused or contributed to by the Contaminants**.**

124.   As a result of Defendants' reckless, negligent, and grossly negligent conduct, this Plaintiff has and continues to suffer severe physical injury, pain, and suffering.

## THE PARTIES: DEFENDANTS

125.   Upon information and belief, Defendant, Northrop Grumman Corporation ("NGC" "Grumman" or "Defendant"), is a corporation organized under the laws of the state of Delaware, with its principal place of business at 2980 Fairview Park Drive in Falls Church, Virginia.

126.   Upon information and belief, Northrop Corporation, the predecessor to Northrop Grumman Corporation, acquired Grumman Corporation, whose primary place of business was in Bethpage, New York, and it was incorporated under the laws of the State of New York.

16

Case 2:22-cv-01432-GRB-AYS     Document 1-1     Filed 03/15/22     Page 20 of 62 PageID #: 44

127.   Defendant, Northrop Grumman Systems Corporation ("NGSC" or "Defendant"), is a subsidiary of NGC, and is organized under the laws of the State of Delaware with its headquarters in Falls Church, Virginia. Upon information and belief, NGSC is the successor in interest to the Grumman subsidiary, Grumman Aerospace Corporation, which was headquartered in Bethpage, New York and incorporated under the laws of the State of New York.

128.   NGC and/or NGSC or their predecessors owned and/or operated the Site at the time of the disposal and/or release of the hazardous and toxic contaminants at the Site.

129.   When reference is made in this Verified Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

130.   The term "Defendant" or "Defendants" refers to both Defendants named herein jointly and severally, including their predecessors.

131.   Each of the Defendants are responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally thereby to Plaintiffs, as alleged, either through each Defendant's own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

17

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

### *The Contaminants*

132.    Many toxic chemicals were used and discharged into the environment by the Defendants during their operations.  The list is by no means closed and is only meant to highlight some of the Contaminants released at the Site by Defendants.

133.    **Volatile organic compounds (VOCs)** are emitted gases from certain solids and liquids, such as paints varnishes, wax, pesticides, products for cleaning, disinfecting, cosmetic, degreasing, and other products. Health effects of exposure to VOCs include eye, nose and throat irritation headaches, loss of coordination and nausea, damage to liver, kidney and central nervous system. Some VOCs are known to be carcinogenic.

134.    **Semi-volatile organic compounds (SVOCs)** are a subgroup of VOCs.  They are highly toxic and difficult to decompose.  Most can cause cancer, reproductive disorders, nervous system damage, and immune system disruption.  Many polycyclic aromatic hydrocarbons (PAHs), a major group of SVOCs, cause cancer, endocrine disruption and affect the immune system.

135.    **Trichloroethylene ("TCE")** is a colorless, volatile, man-made liquid chemical that is used by industry as, among other things, a solvent to remove grease from metal parts. TCE can be released into the air, water, and soil at locations where it is produced, stored, used, or discharged. The United States Environmental Protection Agency ("EPA") and the International Agency for Research on Cancer ("IARC") classify TCE as a human carcinogen.

136.    As used herein, TCE shall include all of its trade names, including but not limited to Acetylene, Anameth, Benzinol, Pholex and any of its degradation breakdown products.

137.    TCE can enter groundwater systems through improper disposal or leaks into the ground. TCE is highly mobile once it enters the soil and will result in substantial percolation into

18

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 22 of 62 PageID #: 46

groundwater aquifers. TCE can remain in groundwater for long periods of time, since it cannot readily evaporate from groundwater.

138.    TCE can enter the human body from the air, water, or soil.

139.    TCE is extremely toxic to humans, even at low concentrations. Acute exposure to TCE has been shown to affect the central nervous system, liver, and kidneys in humans. Chronic exposure to TCE may cause liver and kidney damage, impaired immune system function, and impaired fetal development in pregnant women.

140.    TCE is toxic by inhalation, by prolonged or repeated contact with the skin or mucous membrane, or when taken by mouth. Inhalation of TCE is associated with a higher risk of kidney cancer, renal cell carcinoma, liver cancer, Non-Hodgkin's lymphoma, myeloma, breast cancer, scleroderma (systemic sclerosis) and chronic infertility.

141.    **Polychlorinated Biphenyls ("PCBs")** are odorless volatile synthetic organic chemicals, which are either oily liquids or solids. PCBs enter the environment as mixtures containing a variety of individual chlorinated biphenyl components as well as impurities.

142.    A manufacturing ban for PCBs took effect in 1979 in the United States because there was evidence that PCBs build up in the environment and may cause harmful effects.

143.    Once released into the environment, PCBs do not readily break down and therefore remain for long periods of time cycling between air, water, and soil. PCBs can be carried long distances and have been found in snow and sea water in areas far away from where they were released into the environment.

144.    PCBs have been demonstrated to cause cancer, as well as a variety of other adverse health effects on the immune system, reproductive system, nervous system, and endocrine system. The IARC classifies PCB as a human carcinogen.

19

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 23 of 62 PageID
#: 47

145.    **2-Butanone (Methyl ethyl ketone)** is a colorless and volatile liquid used as a solvent and an additive for making other chemicals.    It is widely used in paints, glues, and other finishes because it rapidly evaporates and will dissolve many substances.

146.    2- Butanone will not stick to soil, and if it is spilled onto soil, it will travel through the soil into underground water sources. Some of the 2-butanone found in soil or water will also evaporate to the air.

147.    Exposure to 2-butanone in humans can cause irritation to the eyes, nose, and throat.  Chronic inhalation studies in animals have reported slight neurological, liver, kidney, and respiratory effects.  Developmental effects, including decreased fetal weight and fetal malformations, have been reported in mice and rats exposed to this chemical via inhalation and ingestion.

148.    **Perchloroethylene ("PERC")** is a manufactured chemical that is widely used for degreasing metal parts and in manufacturing other chemicals.

149.    As used herein, PERC shall include its other names - tetrachloroethylene, tetrachloroethene, and PCE - and any of its breakdown products.

150.    In humans, PERC is known to adversely affect the central nervous system, the liver, kidneys, blood, immune system, and the reproductive system.

151.    Epidemiological studies link PERC exposure in the workplace with several types of cancer, specifically bladder cancer, non-Hodgkin's lymphoma, and multiple myeloma.

152.    The EPA has determined that PERC is likely to be carcinogenic to humans by all routes of exposure.

153.    As used herein, **1,1,1-Trichloroethane (TCA)** shall include all of its trade names, including but not limited to methyl chloroform, methyl trichloromethane, trichloromethyl methane, and trichloromethane.

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 24 of 62 PageID #: 48

154.    1,1,1-Trichloroethane was often used as a solvent to dissolve other substances, such as glues and paints, and to remove oil or grease from manufactured parts. Since 2002, its use has been restricted.

155.    Until the 1990s, 1,1,1 – Trichloroethane formulations usually included 1,4-Dioxane, an emerging contaminant and probable human carcinogen, which was used as a stabilizer/metal inhibitor.

156.    1,1,1-Trichloroethane in groundwater can evaporate and pass through soil as a gas and, finally, be released to the air.

157.    Effects reported in humans due to acute (short-term) inhalation exposure to 1,1,1-trichloroethane include hypotension, mild hepatic effects, and central nervous system (CNS) depression.  Cardiac arrhythmia and respiratory arrest may result from the depression of the CNS.  Symptoms of acute inhalation exposure include dizziness, nausea, vomiting, diarrhea, loss of consciousness, and decreased blood pressure in humans.  After chronic (long-term) inhalation exposure to methyl chloroform, some liver damage was observed in mice and ventricular arrhythmias in humans.

158.    As used herein, **2-Hexanone** shall include all of its trade names, including but not limited to methyl butyl ketone and MBK.

159.    2-Hexanone is a clear colorless liquid that, when in liquid form, evaporates into the air as a vapor.

160.    2-Hexanone was formerly used in paint and paint thinner and in various chemical substances. However, since it was found to have harmful health effects, it is no longer made in the United States and its uses have been restricted.

21

Case 2:22-cv-01432-GRB-AYS   Document 1-1   Filed 03/15/22   Page 25 of 62 PageID #: 49

161.    Humans can take in 2-Hexanone when breathing its vapors, eating food or drinking water that contains it, or coming into contact with it through the skin.

162.    The most important health concern for humans from exposure to 2-hexanone is its harmful effects on the nervous system. These effects were seen in workers who were exposed to 2-hexanone for almost a year. The major effects were weakness, numbness, and tingling in the skin of the hands and feet. Similar effects were seen in animals that ate or breathed high levels of 2-hexanone; these effects included weakness, clumsiness, and paralysis.  The neurotoxic potency of 2-hexanone is increased when combined with 2-butanone (see above).

163.    As used herein, **carbon tetrachloride** shall include all of its trade names, including but not limited to carbon chloride, methane tetrachloride, perchloromethane, tetrachloroethane, or benziform.

164.    Carbon tetrachloride is a manufactured chemical that does not occur naturally. Carbon tetrachloride was used as a cleaning fluid and degreasing agent, in fire extinguishers, and in spot removers. Because of its harmful effects, these uses are now banned, and it is only used in some industrial applications.

165.    Carbon tetrachloride can be trapped in groundwater for long periods of time and will eventually evaporate into the air. Carbon tetrachloride does not generally stick to soil particles.

166.    Carbon tetrachloride is known to adversely affect the cardiovascular, hepatic, and nervous systems in humans.  After exposure to high levels of carbon tetrachloride, the nervous system, including the brain, is affected. Such exposure can be fatal.

167.    **Chromium** is used mainly in metal alloys as chrome plating.  It can be polished to a mirror-like finish, and provides a durable, highly rust resistant coating.  A common form of

22

chromium used by industry in dyes, paints, primers and other surface coatings is hexavalent chromium (chromium VI).

168.    **Hexavalent chromium** enters the environment through industrial applications such as electro painting and chemical manufacturing.  Groundwater contamination may occur due to improper disposal of industrial manufacturing equipment.  It is also released in the form of air emissions from industrial stacks.

169.    Humans can be exposed to hexavalent chromium through contaminated soil, water and air.  Even small amounts of this substance are highly toxic.

170.    Hexavalent chromium is a known human carcinogen.  Inhalation of hexavalent chromium compounds is associated with a higher risk of lung cancer, cancer of the head and neck, and asthma.

171.    Other health impacts of exposure to hexavalent chromium include damage to the skin, liver, kidneys, cardiovascular, reproductive, and gastrointestinal systems.

172.    **Benzene** is a petroleum product and a known human carcinogen that adversely affects the hematological, immune and nervous systems.  Breathing benzene can cause drowsiness, dizziness, and unconsciousness; long-term exposure harms the bone marrow and can cause anemia and leukemia.  Related aromatic hydrocarbons, including, **toluene, xylene, and ethylbenzene**, are used in synthetic materials, fuels, and solvents and are also hazardous to human health.

173.    **Dioxin/furans** are some of the most toxic chemicals known to science.  They may be created in certain industrial processes and are also formed as a by-product of waste incineration. These chemicals can be distributed through the air and are highly toxic.  In addition to cancer, dioxin exposure has been linked to birth defects, reproductive problems, immune, respiratory and skin disorders and hormonal malfunction.

23

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 27 of 62 PageID #: 51

174.    **Radium** is a radioactive metal that has many isotopes, including the hazardous radioactive isotopes radium 226 and radium-228 (collectively "radium").

175.    The EPA and the DEC have established a maximum contaminant level for radium-226 and radium-228 (combined) in drinking water of 5.0 picocuries per liter (pCi/L).

176.    Radium is a hazardous substance and a known human carcinogen.

177.    Exposure to radium can result in an increased incidence of bone cancer, liver cancer, breast cancer, lymphoma, and hematopoietic diseases such as leukemia and aplastic anemia.

178.    Radium-226 decays to a radioactive gas, radon-222 ("radon").

179.    **Radon** is a known human carcinogen and is a leading cause of lung cancer in the United States.

180.    Radon can be dissolved in groundwater and travel through the soil.  It can enter the air inside a home through cracks in the foundation and through aeration of water during its use in washing machines, showers, and cooking.

181.    **1,4-Dioxane** is a synthetic industrial chemical that is completely miscible in water that has been used in many products, including paint strippers, dyes, greases, varnishes and waxes.  1,4-Dioxane is also found as an impurity in antifreeze and aircraft deicing fluids.

182.    1,4-Dioxane is used as a stabilizer for chlorinated solvents such as TCA and for other industrial and laboratory uses.

183.    1,4-Dioxane is classified by the EPA as likely to be carcinogenic to humans by all routes of exposure.  Short-term exposure may cause eye, nose and throat irritation and long-term exposure may cause kidney and liver damage.

24

Case 2:22-cv-01432-GRB-AYS   Document 1-1   Filed 03/15/22   Page 28 of 62 PageID
#: 52

184.    1,4-Dioxane is short-lived in the atmosphere, but may leach readily from soil to groundwater, migrates rapidly in groundwater, and is relatively resistant to biodegradation in the subsurface.

185.    **Perfluoroalkyl and polyfluoroalkyl substances ("PFAS")** are chemical compounds containing fluorine and carbon. They are manmade chemicals that are not naturally found in the environment.

186.    PFAS are used to repel oil and water. These substances have been used for decades in a variety of industrial operations, including metal plating and firefighting foams.

187.    The two most widely studied types of PFAS are perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonate ("PFOS"), which each contain eight carbon atoms.

188.    PFOA and PFOS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.

189.    PFOA and PFOS easily dissolve in water, and thus they are mobile and easily spread in the environment. PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

190.    PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

191.    Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, high uric acid, and high cholesterol.

25

In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

192.     The injuries caused by PFAS can arise months or years after exposure.

193.     Upon information and belief, the Contaminants and their derivatives, in amounts and concentrations above New York State and federal residential and industrial safety levels were and continue to be discharged from the Site, and from the resulting contaminant plumes, polluting the air, soil, and water in the surrounding communities and causing harm to the Plaintiffs.

194.     Upon information and belief, each of the Contaminants is individually toxic and hazardous to human health and the combined effects of exposure to multiple Contaminants cause additional, synergistic adverse impacts.

195.     The presence of certain radioactive and emerging Contaminants became publicly known only recently, as the capability and/or requirements for testing have changed and as specific locations were sampled.

196.     With respect to all of the Contaminants, as well as any new hazardous substances that may be identified as coming from the Site, the Plaintiffs reserve their right to allege additional exposure pathways, contaminant levels, injuries and damages as further information is obtained through discovery, additional environmental testing, medical research, disclosure of government records, and any future updates of public health standards and health advisories.

### *Defendants' Ownership and Use of the Site*

197.     Defendants and/or their predecessors owned and/or operated the Site for several decades.  On information and belief, Grumman's operations at the Bethpage Facility began in 1937 and its use of the NWIRP site began in 1942.  Manufacturing operations at the Site continued until 1996.

26

198.     The uses at the Site included the manufacture and testing of naval aircraft, naval amphibious craft, and satellites for the National Aeronautics and Space Administration.

199.     Throughout its operations at the Site, Grumman used, released, stored and disposed of various hazardous wastes and solvents from industrial processes directly into the environment. These wastes included VOCs, SVOCs, metals, radioactive materials  and other Contaminants.

200.     Grumman knew that the Site is located in close proximity to residential areas.  It knew or should have known that the Contaminants it discharged would migrate into the surrounding environment, contaminating the air, soil and groundwater in the neighborhood of the Site.

### Toxic Air Emissions

201.     As part of its decades-long operations at the Site, Grumman released toxic substances, including but not limited to, TCE and hexavalent chromium, into the air, through its stacks.

202.     These toxic chemicals and other hazardous substances were also released directly into the surrounding environment in the form of fugitive emissions from the manufacturing plants.

203.     Grumman did not take adequate pollution control measures to prevent and mitigate these harmful air emissions.

204.     Grumman knew, or should have known, the toxic nature of these chemicals and hazardous substances before releasing them into the surrounding community.

205.     As a direct result of Grumman's actions and omissions, which created severe air pollution in the community, many Bethpage area residents living in the vicinity of the Site, including each and every Plaintiff, have been to exposed to toxic substances, causing and/or contributing to their injuries.

27

**Hazardous Chemical Discharges to Soil and Groundwater**

206.    Upon information and belief, Grumman had several plants on the Site, where it used TCE as part of the degreasing operations.

207.    Upon information and belief, starting in or about 1970, Grumman used a 4,000- gallon aboveground tank at Plant #2 to store TCE. At some point, Grumman discovered that the tank was leaking and had it replaced. It is unknown how long TCE had been leaking into the ground before the leak was discovered, but Grumman was aware of an unexplained "loss" of TCE for an estimated two or three years prior to discovery of the leak.

208.    Upon information and belief, after an uncontrolled quantity of TCE was discharged into the soil, Grumman finally replaced Plant #2's leaking tank and discovered that the bottom of the tank was already rotten.

209.    Spray wands containing TCE were used to degrease large parts, such as wings of planes. TCE was also used to clean the paint guns used in painting airplanes.

210.    On information and belief, the wastewater generated from the above operations, would be pumped to a tank truck and taken to Grumman's on-site waste treatment plant at Plant #2, known as the Industrial Wastewater Treatment Facility.

211.    The wastewater treated at the Plant #2 Industrial Wastewater Treatment Facility also came from metal finishing operations conducted at both Plant #2 and Plant #3 at the NWIRP.

212.    As described below, the above wastewater, containing many toxic chemicals, was dumped in sludge drying beds in another area of the property, which later became the Bethpage Community Park.

213.    Improper disposal of Contaminants in this area became a major source of groundwater contamination at and emanating from the Site.

Case 2:22-cv-01432-GRB-AYS     Document 1-1     Filed 03/15/22     Page 32 of 62 PageID #: 56

214.     Grumman dug "recharge basins" directly into the ground throughout the Bethpage Facility, which it used, at least in part, to dispose of wastewater. Upon information and belief, there were at least a dozen recharge basins across the Bethpage Facility at various points in its operational history.

215.     These structures were designed to allow the wastewater to infiltrate back into the ground and return to the groundwater supply relied upon by Plaintiffs.  This wastewater contaminated the groundwater at the Site and migrated downgradient, causing the ongoing contaminant plume(s) and soil and vapor contamination in the area.

216.     When the discharge basins became clogged and water could no longer percolate into the ground, Grumman would operate bulldozers to scrape the basins. The contaminated and noxious scrapings obtained from these discharge basins were then used to fill in other low-lying areas on the premises of the Bethpage Facility.  Upon information and belief, these areas were unlined and also became source areas of contamination.

217.     Grumman also had a practice of spraying waste oil on dirt roads at the Site in order to control dust.  Later, petroleum-related substances were found among the Contaminants at and emanating from the Site.

218.     The former NWIRP includes approximately 105 acres of the Site and a separate 4.5-acre parcel to the north of that parcel.  The NWIRP was purchased by the United States Navy in 1947 and leased to Grumman for research, testing, design, engineering and manufacturing purposes. Grumman operated this portion of the Site from 1942 until it closed in 1998.  In 2002, the Navy transferred the 4.5-acre parcel to Nassau County.  In 2008, the Navy transferred 96 acres of the 105-acre main parcel to Nassau County and is leasing the remaining 9 acres to Nassau County.

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 33 of 62 PageID #: 57

219.    At their peak, Grumman's operations at the former NWIRP included four plants used for assembly and prototype testing, a group of quality control laboratories, two warehouse complexes, a salvage storage area, water recharge basins, an Industrial Wastewater Treatment Facility, and several small support buildings.

220.    Starting from the early 1950s, Grumman accumulated and stored drums containing liquid waste materials from operations at Plant 3 and potentially other sources at the former NWIRP in a portion of the Site known as the Drum Marshalling Area. Approximately 200 to 300 drums were stored at any one time.

221.    The waste drums reportedly contained chlorinated and non-chlorinated solvents, liquid cadmium, cyanide and chromium wastes. During the early 1990's, transformers containing PCBs and autoclaves were also stored at the Drum Marshalling Area.

222.    Until 1982, the drum storage area did not have a cover or spill containment.

223.    The soil contaminants found at in the Drum Marshalling Area include polychlorinated biphenyls (PCBs), chlordane, polynuclear aromatic hydrocarbons (PAHs), and metals.

224.    Subsequent testing determined that the Drum Marshalling Area was a source of groundwater contamination at and emanating from the Site.

225.    120 cesspools located in the vicinity of Plant 3, which were part of the stormwater management system at the Site, were found to contain PCBs. PCB-containing fluids are suspected to have entered the system through floor drains in Plant 3 and impacted the underlying soil by passing through permeable well bottoms. These discharges were yet another source of contamination at and emanating from the Site.

30

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 34 of 62 PageID #: 58

## Bethpage Community Park and Former Grumman Settling Ponds

226.    The land that comprises the current Bethpage Community Park was originally primarily farmland and was purchased by Grumman in 1941.

227.    From approximately 1943 through 1962, Grumman utilized a portion of this area, known as the Former Grumman Settling Ponds, for disposal of wastewater and other wastes from its industrial operations the Site.  Among the various wastes were chromium, PCBs and VOCs used for cleaning or degreasing machinery or fabricated parts.

228.    The toxic sludge generated at the Industrial Wastewater Treatment Facility was transported to the Former Grumman Settling Ponds and placed in one of two sludge drying beds.

229.    Spent rags generated during the wipe-down process of a paint booth water curtain located at Plant #2 were also transported to a nearby area, where they were emptied into a pit ("rag pit"). Used oil may have also been discarded in the rag pit.

230.    This area was also utilized as a wastewater discharge recharge area and fire training facility where waste oil and jet fuel were ignited and extinguished.

231.    Defendants' operations in this area resulted in the release of Contaminants into the surrounding soil and groundwater, creating a deep, toxic plume.

232.    In October 1962, Grumman donated this land, comprising approximately 18 acres near the intersection of Stewart Avenue and Cherry Avenue in Bethpage, to the Town of Oyster Bay, for use as parkland. Shortly thereafter, Bethpage Community Park, as it appears today, was constructed on the property, and is accessible to community residents year-round.

233.    The Park contains a ball field area, an active storm water recharge basin, a parking area, the Town Ice Skating Rink, and the Town Pool.

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 35 of 62 PageID #: 59

234.    Within the Park, the ball field area was built over the location of the Former Grumman Settling Ponds.

235.    NGSC remains the current owner of the Grumman Access Road, a closed private road in the vicinity of the Park associated with the former Plant.

236.    Bethpage High School is located directly to the east of the Park, across Stewart Avenue, and residential properties are located south of the Park across from the Access Road.

237.    In March of 2002, Grumman conducted soil sampling in the Park. The analytical results indicated levels of PCBs and metals exceeding the DEC's Soil Cleanup Objectives. The Park was temporarily closed but was reopened later that year.    The ball field remains closed to this day.

238.    In July of 2005, Northrop Grumman Systems signed a Remedial Investigation and Feasibility Study Order on Consent for the contaminated area encompassing the Former Grumman Settling Ponds, Adjacent Areas of the Bethpage Community Park, and the Grumman Access Road, collectively known as OU-3.

239.    Between 2006 and 2007, the Town of Oyster Bay excavated and disposed of approximately 175,000 cubic yards of contaminated soil from a 7 acre area of the Park as part of the construction of a new ice rink.

240.    Subsequently, in 2008 a Remedial Investigation Report for OU-3 identified 16 contaminants of concern, including the Contaminants.  The Report concluded that the southwest portion of the Park is a continuing source of groundwater contamination.

241.    The ballfield at the Park, continues to be closed due to heavy contamination.   Actual remediation of that site by Grumman began only in 2020 and is ongoing.

242.    In 2019, a new area of contaminated soil, just outside the ballfield and in the parking lot, was discovered during drilling activities conducted by Grumman.  Sampling confirmed the

Case 2:22-cv-01432-GRB-AYS     Document 1-1     Filed 03/15/22     Page 36 of 62 PageID
#: 60

presence of VOCs, at levels exceeding state standards, in an area about two to eight feet thick between

36 to 50 feet beneath the ground surface. Additional remediation has commenced for this area.

243.    Area residents, including many of the Plaintiffs, were exposed to Defendants'

Contaminants while visiting and using the Park for recreation.

### OU-1, OU-2, OU-3, OU-4

244.    In 1983, the Grumman and NWIRP sites, excluding the Park, were listed in the

Registry of Inactive Hazardous Waste Disposal Sites in New York State.

245.    In December 1987, the Bethpage Facility was reclassified as a "Class 2 Site," or a site

posing a "[s]ignificant threat to the public health or environment" and requiring remedial action.

246.    In March 1993, the Grumman site and the NWIRP site were separated and listed as

independent class 2 Superfund sites, designated as Site 130003-A and Site 130003-B, respectively.

247.    In order to address the on-site and off-site contamination, the DEC divided it into three

Operable Units ("OU").

248.    OU-1 encompasses the former manufacturing plant areas on site.

249.    In 1995, the DEC issued Records of Decision ("ROD") for the Northrop Grumman

and NWIRP Sites concerning on-site soil contamination in OU-1.

250.    OU-2 consists of an extremely large groundwater contamination plume that is

continuously moving south-southeast. The source area of the OU-2 plume originates from both the

NWIRP and Northrop Grumman properties, with VOCs present at different concentrations and

different depths. OU-2 includes a network of wells which are used to monitor this plume.

251.    In March of 2001, the NYSDEC issued a ROD for OU-2. This ROD provided for

wellhead treatment at impacted public water supply wells, boundary monitoring of the plume, and the

33

contingency for additional wellhead treatment should other wells be affected.  The ROD also included on-site extraction wells and treatment systems, which are currently in operation.

252.   Among other things, the 1995 and 2001 RODs found that groundwater plumes in and around the Site contained TCE and other chlorinated VOCs.

253.   In May 2015, the DEC entered into a Consent Order with Northrop Grumman to remediate "hot spots" identified in the larger OU-2 groundwater plume.

254.   OU-3 encompasses the source area of the Former Grumman Settling Ponds, adjacent areas of the Park, and the Grumman Access Road.  It has also been used to refer to the off-site plume of contaminants flowing from these areas.

255.   The groundwater flow direction is primarily horizontal with a downward component to the south-southeast.   OU-3 leaves the Site as a distinct plume, but then becomes comingled with the larger OU-2 plume.

256.   Generally, the OU-3 plume is deeper and more concentrated than the larger OU-2 plume. It has impacted both the Upper Glacial and Magothy aquifers.

257.   In March 2013, the DEC issued a ROD for the remediation of OU-3.  With respect to the off-site groundwater plume, the ROD required the immediate treatment of the area of elevated concentrations, or "hotspot" area of the plume that had been identified approaching Bethpage Water District Plant 4.  The ROD also called for additional monitoring wells to allow for the delineation of the leading edge of the OU-3 plume.

258.   OU-4 was established to by the U.S. Navy to specifically address contaminated oil, soil vapor and groundwater at the former Drum Marshaling Area designated at Site 1.

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 38 of 62 PageID #: 62

259.    A ROD issued for this area in August 2018, calls for limited excavation and disposal of PCB-contaminated soil, the installation of a reduced permeability cover, and land use controls to protect the cover and limit future activities.

260.    To implement this plan, the Navy has removed approximately 45,000 cubic yards of contaminated soil, as well as concrete debris from the former cesspools and settling tanks.   It has yet to install an expanded soil vapor extractions system and new groundwater monitoring wells.

261.    All of the above efforts were limited to discrete source areas and were not intended to or sufficient to remediate the full extent of the contaminant plumes.

### 2019 Cleanup Plan – Full Hydraulic Containment of the Plume

262.    Realizing the continuing and expanding threats to groundwater resources and local residents, in February 2017, Governor Cuomo directed the DEC to undertake an immediate engineering investigation to expedite containment of the plume.

263.    In May of 2019, after over two years of engineering and groundwater modeling investigations in partnership with the US Geological Survey, the DEC released a Proposed Amended Record of Decision ("ROD") regarding off-site groundwater. At the end of the public comment period, the Amended ROD was issued in its final form in December 2019.[1]

264.    The Amended ROD (at p. 13) specifically identifies 26 "contaminants of concern" in the contaminated groundwater plume originating at the Site.

265.    The DEC estimates that the resulting toxic plume currently extends approximately 4.3 miles south toward the Southern State Parkway and, at its widest point, is about 2.1 miles wide.  The depth of the plume varies from 200 to 900 feet below ground.

---

[1] Access to the AROD and other project documents is available online through the DEC info Locator: https://www.dec.ny.gov/data/DecDocs/130003A/   or https://www.dec.ny.gov/data/DecDocs/130003B/.

35

266.    The Amended ROD sets forth a 110 (one hundred and ten) year, $585,000,000 (five hundred eighty five million dollars) plan to stop the spread of and, eventually, clean up the plume.

267.    The work plan involves installing 24 groundwater extraction wells - eight of them located in the interior of the plume and 16 along the margins, five treatment plants, four recharge basins and approximately 24 miles of conveyance piping all around the affected region of the plume installed to bring that water from the wells to five nearby treatment plants.

268.    Defendant Grumman initially rejected the proposed remedy as unnecessary and not cost-effective.   The other responsible party, the Navy, also filed comments, rejecting the plan.

269.    However, after a year of negotiations, Grumman  agreed to implement a modified version of the AROD.  As part of that agreement, Grumman will pay a $104 million settlement for environmental damages.

270.    Based on a Proposed Consent Decree between Defendant Northrop Grumman Systems Corporation and the NYSDEC, made public on or about September 22, 2021[2], Grumman has also agreed to pay the State of New York $4,000,000 (four million dollars),  of which $3,600,00 would go to cover the State's investigation costs and $400,0000 shall be for the costs of the assessment of natural resources damages. As of the date of this filing, the Consent Decree has yet to be finalized and approved by the District Court for the Eastern District of New York.

271.    No portion of the DEC's cleanup plan or the above proposed payments will go to compensating area residents, including Plaintiffs, for the personal injuries, increased risk of illness due to toxic exposure, or property damages which they have incurred as a result of  Defendants' actions.

---

[2] https://www.dec.ny.gov/docs/remediation_hudson_pdf/grummanpropcd.pdf

36

272.     While the initial construction and maintenance operations costs are to be spread over 30 years, the full cleanup will take many more decades. Based on the above plan and timeframes, it is evident that Plaintiffs who still reside in or around the Bethpage area have and will continue to reside in areas impacted by the contamination for the foreseeable future.

### Impacts on Drinking Water

A. Chlorinated Solvents - Generally

273.     The 2019 Amended ROD states that 11 public water supply wells have been impacted and 16 public water supply wells are threatened by the Grumman groundwater plume.

274.     The above document reiterates and confirms that Defendants' past disposal practice has contaminated both on-site and off-site groundwater with chlorinated solvents.

275.     In 2016, the Town of Hempstead and the Bethpage Water District sued the Defendants and others over contamination of their public water supply wells in Levittown and Bethpage.

276.     On information and belief, the Bethpage Water District action was dismissed on statute of limitations grounds, while the Town of Hempstead's action is still pending.

277.     In May 2018, the Bethpage Water District announced that it will be shutting down five of its public water supply wells due to the contamination caused by Defendants.

278.     A Health Consultation report issued in May 2019 by the New York State Health Department ("Health Consultation")[3] concludes that past use of drinking water contaminated with TCE from the Site, at all times prior to the removal from service of Bethpage Water District Well 6-1 in 1976, could have harmed people's health.

---

[3] The NYSDOH Health Consultation report is available at:
https://www.health.ny.gov/environmental/investigations/northrop_grumman/

37

279.     The Amended ROD notes that, in 1976, TCE was detected in Well 6-1 at concentrations of 28, 26 and 60 ppb, which is many times the safe limit.   Bethpage Water District Well 6-2 was also taken out of service in 1988, after a detection of TCE at 5 parts per billion ("ppb"). Both wells were returned to service after treatment systems were installed.

280.     Bethpage Water District's Plant 4 and Plant 5 wells were also impacted by TCE, though at lower levels.  Treatment systems for these wells were installed in 1995. See Amended ROD, p. 17.

281.     The Health Consultation acknowledged impacts of Site-related hazardous substances on other wells used by the Bethpage Water District, but concluded that they were either taken out of service or equipped with treatment systems.

282.     The Health Consultation did not address the actual cancer or other disease incidence in the population of the affected area, the cumulative impacts of multi-year exposure to low levels of toxins, such as TCE, prior to the installation of treatment systems, the presence of 1,4-dioxane and radium in the water, discussed below, or any exposure pathways other than drinking water in the Bethpage Water District.

283.     Among the other public water suppliers whose wells have been impacted by Grumman's site-related contaminants are the South Farmingdale Water District and the Seamans Neck Road Water Plant operated by the New York American Water Company.  These wells had treatment systems installed in 2011-2013 and 2012-2015, respectively. See Amended ROD, pp. 17-18.

284.     Defendants are liable for Plaintiffs' exposure to contaminated drinking water from any and all impacted public supply wells.

B.    <u>Radium and Radon Detections</u>

285.    On information and belief, Grumman's operations at the Site included quality control and research projects including radionuclides and the use of radium-based paint on luminous dials on aircraft instruments and spacecraft components.

286.    On information and belief, in January 2013, the Bethpage Water District detected radium at 5.87 pCi/L (pico Curies per liter) in its drinking water Well 4-1, which is located southeast of the Site.

287.    This reading is a violation of federal and New York State's maximum contaminant level (MCL) for drinking water, which is 5 pCi/L, for the combined radium isotopes 226 and 228.

288.    As a result, well 4-1 had to be taken out of service.

289.    Upon information and belief, Plaintiffs who were or are customers of the Bethpage Water District have been exposed to elevated levels of radium in their drinking water, at least before the decommissioning of Well 4-1 in 2013.

290.    Subsequently, testing of monitoring wells at the Bethpage High School and the Central Boulevard Elementary School conducted in 2017 revealed elevated levels of radium.  On information and belief, radium was found at two to five times the maximum contaminant levels.

291.    Both schools are located within the area of the contaminant plumes emanating from the Site, with the high school being across the street from the Park and the elementary school about a mile to the south of it.

292.    In 2017, the Bethpage School District conducted testing for radon gas.  Although the results from the elementary school were not released, on information and belief, levels of radon found at the high school and middle school were at close to 4.0 pCi/L, a ceiling above which corrective action is recommended by the Environmental Protection Agency.

39

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 43 of 62 PageID #: 67

293.    On information and belief, the School District installed a soil vapor barrier at the elementary school to minimize radon exposure.

294.    Additional groundwater sampling conducted at the Site by the US Navy in 2018 and 2019 found radium levels above federal and state standards in sixteen discreet samples from eight different wells, with the highest being 9.5 pCi/L.

295.    Although the Navy has assured residents that the findings are within the range of "background levels," its data has been questioned, because its consultant, Tetra Tech, was caught falsifying environmental testing data at another Superfund Site in 2017, and is now being sued by the U.S. Justice Department.   As a result, U.S. Senator, Chuck Schumer, has demanded that the testing be repeated using another consultant.

296.    A Preliminary Assessment/Site Investigation report analyzing the Navy's findings has yet to be submitted to the DEC.

297.    None of Defendants' cleanup efforts to date address the possible presence of radium in the groundwater and drinking water or of radon in the soil vapor in areas impacted by the contaminant plume.

298.    The December 2019 Amended ROD does not include a plan to address radium-226, radium-228, and radon.   As of this writing, there is no routine testing by Defendants or any government agency for radioactive contaminants in the groundwater emanating from the Site.

299.    To the extent it is confirmed that the elevated levels of radioactive substances in the soil vapor and groundwater in and around Bethpage are due to Defendants' activities, Defendants are liable for any personal injuries and/or increased health risks caused to Plaintiffs as a result of their past and/or current exposure to these toxic substances.

40

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 44 of 62 PageID #: 68

C.    Emerging Contaminants: 1,4 – Dioxane

300.    Upon information and belief, 1,4-Dioxane was used by Grumman in its industrial operations at the Site and has been detected in the contaminant plumes.

301.    1,4 – Dioxane is one of the "contaminants of concern" identified in the State's 2019 Amended ROD.

302.    New York State has adopted an MCL of 1.0 ug/L (parts per billion) for 1,4-Dioxane in drinking water.

303.    This standard, which is mandatory for all public water suppliers, went into effect in August 2020.

304.    Sampling conducted by the Navy in 2018 and 2019 confirms that the levels of 1,4-Dioxane in groundwater at the Site are many times higher than the MCL.

305.    This toxic chemical has migrated off-site and contaminated the drinking water supply.

306.    According to available data from the Bethpage Water District, 1,4-Dioxane is present at levels many times 1.0 ppb in the public water supply wells used by the Plaintiffs.

307.    Upon information and belief, Plaintiffs who were or are customers of the Bethpage Water District have been exposed to harmful levels of 1,4-Dioxane in their drinking water as a result of Defendants' actions.

308.    Other nearby water districts within the range of the Grumman contaminant plume have also detected 1,4-Dioxane in their water supply at levels above what is now deemed safe.

309.    Upon information and belief, Plaintiffs who were or are customers of these water districts have been exposed to harmful levels of 1,4-Dioxane in their drinking water as a result of Defendants' actions.

41

Case 2:22-cv-01432-GRB-AYS Document 1-1 Filed 03/15/22 Page 45 of 62 PageID #: 69

D. Emerging Contaminants: PFAS

310.   Upon information and belief, Defendants' operations at the Site, have also contaminated the groundwater and drinking water supplies of the Plaintiffs with toxic perfluoroalkyl and polyfluoroalkyl substances (PFAS).

311.   On or around May 19, 2016, the EPA issued updated Drinking Water Health Advisories, recommending that drinking water concentrations for PFOA and PFOS, either singly or combined, should not exceed 70 ppt (parts per trillion).[4]

312.   In June 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and EPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.

313.   Effective April 25, 2016, the NYSDEC added PFOS and PFOA to the New York State 6 NYCRR Part 597 list of hazardous substances, making it a hazardous waste pursuant to New York State Environmental Conservation Law Article 27, Title 13 and 6 NYCRR Part 375.

314.   New York State has adopted an MCL of 10.0 ppt or 0.0000100 milligrams per liter (mg/L) for PFOA and 10.0 ppt or 0.0000100 mg/L for PFOS in drinking water.

315.   This standard, which is mandatory for all public water suppliers, went into effect in August 2020.

316.   In 2018 and 2019, as part of its Preliminary Assessment/Site Inspection for Per- and Polyfluoroalkyl Substances, the U.S. Navy conducted several rounds of testing at wells, recharge basin and treatment systems in and around the NWRIP portion of the Site.

---

[4] Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS, 81 Fed. Reg. 33, 250-51 (May 25, 2016).

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 46 of 62 PageID #: 70

317.    Five of the monitoring wells showed levels of PFAS that were not only many times New York's MCL, but even exceeded the EPA's current Health Advisory limit of 70 ppt.  The highest PFAS concentration was 239 ppt.

318.    PFAS was also detected at levels well above the MCLs at the NWRIP Recharge Basins and the Interim Remedial Measures treatment system at the Site.

319.    In its November 2019 Fact Sheet summarizing the above results, the Navy specifically noted that plating and anodizing operations were conducted by Grumman at Plant 3 and Plant 5 and likely used PFAS compounds in a mist-suppression system.

320.    Fact Sheet explains that the entire NWRIP portion of the Site was used by Defendants for research, testing, design engineering, fabrication, and primary assembly of military aircraft, from 1942 to 1996.

321.    In addition, Grumman operated a fire training area on site.

322.    These and other operations elsewhere at the Site involving aircraft, weapons, and satellite manufacture and testing likely involved the storage, use and discharge of  PFAS, including through the use of AFFF firefighting foam containing PFAS.

323.    Sampling of monitoring wells by Arcadis, Grumman's environmental consultant, reveals highly elevated PFAS levels in the groundwater.

324.    The Hempstead Water District, the Bethpage Water District, and the South Farmingdale Water District, all of which have been impacted by Site-related groundwater contamination, have had recent detections of PFAS at various levels, including above the MCL.

325.    None of the cleanup plans issued or approved by the State address the PFAS contamination in the groundwater at and coming from the Site.   In its Responsiveness Summary for the Amended ROD, issued in December 2019, the DEC states only: "As needed, the Public Water

43

Supply Contingency Plan will be updated to reflect emerging contaminants and other currently unknown contaminants that may be associated with the NWIRP and Northrop Grumman Bethpage Facility sites."

326.     In the meantime, on information and belief, Plaintiffs have been and continue to be exposed to toxic levels of PFAS in their drinking water supplies, which are contaminated as a result of Defendants' operations at the Site.

## The Defendants Have Not Remediated the Contamination

327.     The remediation plans, if any, set forth by Defendants were and still remain inadequate and insufficient given the breadth of the contamination, as well as the present and historical migration of the harmful contaminants. Defendants have repeatedly failed to exercise the reasonable care necessary to eliminate, correct, and/or remedy the dangerous condition created by them and/or located upon their land.

328.     Further, Defendants have intentionally delayed and repeatedly chosen meaningless courses of action, patently inadequate and unreasonable given the likely injuries to Plaintiffs.

329.     Defendants also challenged and delayed implementing the work required by the 2019 Amended ROD, which finally proposes a comprehensive cleanup and containment of the contaminated groundwater plume emanating from the Site, a cleanup that is estimated to take 110 years.

330.     It took an entire year to get an agreement in principal that Defendants will conduct some of the remedial actions proposed in the AROD.  None of them include testing of residential properties or compensation for the toxic exposure and injuries suffered by former and current residents, including Plaintiffs.

44

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 48 of 62 PageID #: 72

331.    The actions chosen and taken by Defendants were with knowledge that delay and minimal action would cause the toxic contaminants to disperse and migrate from the Site and into the surrounding residential neighborhood, impacting Plaintiffs and Class members and their property. These actions have been undertaken with actual malice and in wanton and willful and/or reckless disregard for Plaintiffs' health and property.

332.    As a result of Defendants' negligent, willful, and/or wanton storage, disposal, and release of the Contaminants into the soil and/or groundwater, and/or the subsequent and continuing failure to remediate or take reasonable action to mitigate the release and migration of said substances, the plumes of contaminants, at concentration levels in excess of federal and/or state regulatory limits,  have and continue to migrate throughout the areas downgradient of the Site and onto the properties of Plaintiffs. These toxic chemicals have entered the water, soil, indoor and outdoor air, causing Plaintiffs' injuries.

333.    In addition, the damage to Plaintiffs includes exposure to toxic air emissions, unsafe drinking water, soil vapor intrusion, and other pathways of exposure through soil, air and groundwater.

334.    The presence of the Contaminants on and off Site in Plaintiffs' neighborhood and on and under their places of residence, school, work and recreation sites has resulted in permanent and continuing harm to Plaintiffs' persons.  Plaintiffs have been and continue to be exposed to the Contaminants by inhalation, ingestion, and dermal exposure.

335.    The numerous egregious actions and incidents occurring at and near the Site by Defendants constitute an intentional and/or negligent breach of their duty of reasonable care and violations of New York State law.

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 49 of 62 PageID #: 73

336.    Defendants, through their negligent and/or reckless acts, have repeatedly and unreasonably invaded each and every Plaintiff's right to possession and undisturbed occupancy of their residences and have repeatedly trespassed thereon by causing migration of toxic contaminants onto Plaintiffs' real properties and harm to their persons.

## AS AND FOR A FIRST CAUSE OF ACTION:
## NEGLIGENCE

337.    Plaintiffs re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

338.    Negligence may exist both as an omission as well as an affirmative act. A cause of action sounding in negligence allows for the recovery for an injury that was proximately caused by another's violation of a duty of reasonable care.

339.    Here, the Defendants, as owners and operators of business(es) at the Site that managed, stored, used and disposed of toxic contaminants and solvents, owed Plaintiffs a cognizable duty to exercise reasonable care in the manufacturing process, storage, transportation, and disposal of toxic chemicals, including but not limited to the Contaminants, and in the maintenance of their tools and equipment used for such acts.

340.    Defendants breached their duty of reasonable care, which a reasonably prudent person should use under the circumstances, by causing and/or allowing and/or failing to prevent the release of the Contaminants into the air, soil, and groundwater in and around the Site and the migration of the Contaminants towards and onto residential property, including property occupied by Plaintiffs.

46

341.    The release of the Contaminants into the air, soil and groundwater is the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well-being and to their properties.

342.    Upon learning of the release of the Contaminants, Defendants owed Plaintiffs a duty to timely notify Plaintiffs that these had occurred in the vicinity of Defendants' operations at the Site.

343.    Defendants breached that duty by failing to timely notify the Plaintiffs of the releases of the Contaminants at the Site, and, consequently, in the vicinity of Plaintiffs' homes.

344.    As a result of Defendants' breaches of their duty to timely notify the Plaintiffs, the Plaintiffs were forestalled from undertaking effective and immediate remedial measures and Plaintiffs have expended and/or will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

345.    Upon learning of the release of the Contaminants, Defendants owed Plaintiffs a duty to warn the Plaintiffs of the release of the Contaminants and the dangers to the Plaintiffs and their properties that resulted therefrom.

346.    Defendants breached this duty by failing to adequately warn the Plaintiffs of the release of the Contaminants and the potential dangers and harms that could result.

347.    The Defendants' failure to warn is the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well-being and to their properties.

348.    Defendants further had a duty to the Plaintiffs, upon learning of the release of the Contaminants, to act reasonably to remediate, contain, and eliminate the discharges before the Contaminants injured Plaintiffs and their property and/or to act reasonably to minimize the damage to Plaintiffs.

Case 2:22-cv-01432-GRB-AYS   Document 1-1   Filed 03/15/22   Page 51 of 62 PageID #: 75

349.    Defendants breached that duty by failing to act reasonably to remediate, contain, and eliminate the discharges in a timely and effective manner before the Contaminants injured Plaintiffs and their property and/or to act reasonably to minimize the damage to Plaintiffs.

350.    As a result of Defendants' breaches of their duty to Plaintiffs by failing to act reasonably to remediate, contain, and eliminate the discharges, the Defendants' actions and omissions are the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well-being and to their properties.

351.    Defendants had a duty to the Plaintiffs to ensure that all of their facilities were safe and sufficiently secure as to prevent the release of the Contaminants into the environment surrounding their facilities and into the Plaintiffs' homes.

352.    Defendants negligently breached their duties to the Plaintiffs to ensure that all their facilities were safe and sufficiently secure as to prevent the release of the Contaminants into the environment.  As a result of this breach, Contaminants entered into the indoor and outdoor areas used by the Plaintiffs and into Plaintiffs' homes and injured Plaintiffs.

353.    Defendants had a legal duty to promptly and properly investigate and remediate the contamination from their activities at the Site and had full knowledge of the threat it poses to human health and safety.

354.    Defendants willfully and wantonly breached their legal duty to promptly and properly investigate and remediate the contamination, despite full knowledge of the threat it poses to human health and safety.  This failure is the proximate and legal cause of the injuries suffered by the Plaintiffs to their health and well-being and to their properties.

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 52 of 62 PageID #: 76

355.    At the time Defendants breached their duties to Plaintiffs, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to Plaintiffs so apparent as to entitle Plaintiffs to be protected against such actions or inactions.

356.    Accordingly, Plaintiffs seek damages from Defendants, in an amount to be determined at trial, in a sufficient amount to compensate them for the injuries and losses sustained, including but not limited physical pain and suffering, physical disabilities, mental anguish, loss of the enjoyment of life's pleasures, inability to participate in Plaintiffs' usual employment and activities, lost income and lost earning opportunities, medical expenses (past and future), economic loss, loss of companionship, services and support and other damages which are the natural and proximate result of Defendants' conduct.

## AS AND FOR A SECOND CAUSE OF ACTION:
### ABNORMALLY DANGEROUS ACTIVITY

357.    Plaintiffs re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

358.    Activities such as the disposal of hazardous chemical wastes constitute an abnormally dangerous activity for which strict liability will apply.

359.    Defendants' aforesaid failure to employ reasonable care which a reasonably prudent person should use under the circumstances in the manufacturing process and by storing, transporting, disposing of, or otherwise handling toxic substances, including the Contaminants, constitutes ultra-hazardous and abnormally dangerous activities involving ultra-hazardous, abnormally dangerous substances.

360.    Defendants allowed or caused these ultra-hazardous and abnormally dangerous substances to leak into the surrounding air, land and groundwater, and in doing so, failed to warn Plaintiffs of the dangerous condition that was caused thereby.

49

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 53 of 62 PageID #: 77

361. The risks posed by such activities outweigh any value associated with the same. As a result of said ultra-hazardous and abnormally dangerous activities, Plaintiffs have suffered damages and imminent, substantial and impending harm to their health, families, and home values. Plaintiffs have expended or will be forced to expend significant resources to address their injuries caused by the contamination indefinitely for years and decades into the future.

362. By reason of the foregoing, Defendants are strictly liable in tort for the damages sustained by Plaintiffs.

363. Accordingly, Plaintiffs seek damages from Defendants, in an amount to be determined at trial, in a sufficient amount to compensate them for the injuries and losses sustained, including but not limited physical pain and suffering, physical disabilities, mental anguish, loss of the enjoyment of life's pleasures, inability to participate in Plaintiffs' usual employment and activities, lost income and lost earning opportunities, medical expenses (past and future), economic loss, loss of companionship, services and support and other damages which are the natural and proximate result of Defendants' conduct.

### AS AND FOR A THIRD CAUSE OF ACTION:
### PRIVATE NUISANCE

364. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

365. Under a cause of action for private nuisance, Parties may be subject to liability for environmental contamination if their conduct invades another's private use and enjoyment of land and if such invasion is: 1) intentional and unreasonable; 2) negligent or reckless; or 3) actionable under the rules governing liability for abnormally dangerous conditions or activities.

50

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 54 of 62 PageID #: 78

366.    Defendants owned, occupied, controlled and/or still own, occupy and control the real property at the Site.

367.    Defendants owned, occupied, controlled and/or still own, occupy and control their real property in such a way as to create and/or maintain and continue a dangerous and/or hazardous condition.

368.    At all times mentioned herein, Defendants had knowledge and/or notice of the dangerous condition that the Contaminants in the air, soil and the toxic groundwater plumes presented and failed to take reasonable steps to clean up, correct, or remediate that condition.

369.    Additionally, Defendants owed a duty to Plaintiffs to take reasonable action to eliminate, correct, or remedy any dangerous condition existing on Defendants' property that was reasonably foreseeable to injure Plaintiffs and/or Plaintiffs' real property, and of which they had knowledge and/or notice.

370.    Further, Defendants owed a duty to Plaintiffs to exercise reasonable care and skill in the construction, maintenance, use or management of their property to prevent a structure, appurtenance, or condition thereon from endangering the neighboring premises and occupants. Defendants have breached these duties, and each of them, by negligently, willfully, and/or wantonly creating a dangerous condition on their property by allowing massive quantities toxic contaminants to be spilled, disposed of, or otherwise released into the air, ground, soil, groundwater and/or aquifer on their property. This dangerous condition is reasonably foreseeable to cause injury and damage to Plaintiffs and their property due to the size and nature of the releases of the Contaminants and the proximity of Plaintiffs and their properties.

51

Case 2:22-cv-01432-GRB-AYS   Document 1-1   Filed 03/15/22   Page 55 of 62 PageID #: 79

371. Defendants owed a duty to Plaintiffs to exercise reasonable care to keep the dangerous contaminants and their byproducts from being discharged or allowed to escape, enter surrounding properties, and cause injury and damage.

372. Defendants breached their duty to Plaintiffs by failing to exercise reasonable care and skill in the construction, maintenance, use or management of their property to prevent a structure, appurtenance, or condition thereon from endangering the neighboring premises and occupants. Specifically, Defendants negligently, willfully, and/or wantonly allowed massive quantities of Contaminants to be disposed of, or otherwise released into the air, soil, groundwater and/or aquifer at the Site.

373. Defendants further breached their duty to Plaintiffs by failing to exercise reasonable care and by maintaining their property in such a condition as to allow large and unknown quantities of the Contaminants to degrade, mix with other chemicals, and escape from their property and enter onto and under adjacent areas, including Plaintiffs' properties. The above-described breaches endangered, injured, and damaged the Plaintiffs. Such a dangerous condition is reasonably foreseeable to cause injury and damage to Plaintiffs and their properties.

374. Defendants also breached their duty by continuing and maintaining this dangerous condition at the Site that was reasonably foreseeable to injure Plaintiffs and their real property.

375. Plaintiffs have suffered foreseeable injury and damages proximately caused by the negligent creation and/or maintenance of the dangerous condition by Defendants.

376. Defendants owed a duty to Plaintiffs to refrain from creating and/or maintaining a dangerous condition on Defendants' properties that was reasonably foreseeable to injure Plaintiffs and their real property.

377.    Defendants breached that duty by causing dangerous Contaminants to be released onto Plaintiffs' land and caused noxious gases, fumes and odors to emanate from the soil and into the homes.

378.    Accordingly, this breach has caused Plaintiffs injury to their persons and property that is certain, substantial, and this resulting condition interferes with Plaintiffs' physical comfort.

379.    Furthermore, as  the new State mandated Amended ROD requires installing 24 groundwater extraction wells, five treatment plants, four recharge basins and approximately 24 miles of conveyance piping to contain and treat the contamination, those Plaintiffs who currently reside in or near the affected neighborhoods, will suffer the additional nuisance, loss of value, disturbance and damages caused by the above work.

380.    Accordingly, Plaintiffs seek damages from Defendants, in an amount to be determined at trial, in a sufficient amount to compensate them for the injuries and losses sustained, including but not limited physical pain and suffering, physical disabilities, mental anguish, loss of the enjoyment of life's pleasures, inability to participate in Plaintiffs' usual employment and activities, lost income and lost earning opportunities, medical expenses (past and future), economic loss, loss of companionship, services and support, and other damages which are the natural and proximate result of Defendants' conduct.

381.    In addition, those Plaintiffs who are current property owners in the area of the contaminant plumes seek general damages directly flowing from the nuisance, including, but not limited to the difference between the current value of their property and such value if the harm had not been done, the cost of repair or restoration, and consequential damages flowing from the nuisance.

FILED: NASSAU COUNTY CLERK 02/17/2022 10:54 AM
NYSCEF DOC. NO. 1

INDEX NO. 602063/2022
RECEIVED NYSCEF: 02/17/2022

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 57 of 62 PageID
#: 81

## AS AND FOR A FOURTH CAUSE OF ACTION:
## TRESPASS

382.    Plaintiffs re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

383.    Environmental contamination of a property constitutes a trespass as it interferes with the conditions of the property. This act of trespass is, in and of itself, objectionable.

384.    Upon information and belief, Defendants had exclusive control over the Site at all relevant times.

385.    Upon information and belief Defendants' negligent, willful, and/or wanton actions and/or intentional failures to act caused an uncontrolled quantity of Contaminants to be spilled, disposed of, or otherwise released into the air, ground, soil, groundwater, and aquifer at the Site.

386.    Upon information and belief, the Contaminants spilled, disposed of, or otherwise released into the air, soil, groundwater, and aquifer at the Site entered and trespassed upon the land and realty of the Plaintiffs, thus interfering with the condition of Plaintiffs' properties, causing an injury to their possession and/or right of possession.

387.    Upon information and belief, Defendants took affirmative, voluntary, and intentional actions to store, use, and transport in an unsafe manner and/or intentionally to dispose of the Contaminants into the  air and ground.

388.    Upon information and belief, at the time that the above described affirmative, voluntary, and intentional acts were performed, Defendants had good reason to know or expect that the large quantities of Contaminants would pass through the air, soil, groundwater, and aquifer from Defendants' land to the land of Plaintiffs and the neighboring properties.

389.    Upon information and belief, the above-described affirmative, voluntary, and intentional acts were performed with the willful intent and or reckless indifference to the fact that

54

the Contaminants would necessarily be dispersed through the air, soil, groundwater, and aquifer and migrate onto the property of Plaintiffs, causing personal injury and property damage to Plaintiffs.

390.    Defendants' actions in disposing of uncontrolled amounts of the Contaminants into the ground were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiffs' rights, health and property.

391.    These voluntary actions resulted in the immediate and continued trespass of the Contaminants on the Plaintiffs' properties, thus interfering with the condition of Plaintiffs' property, causing personal injury and damage to Plaintiffs' health and damage to their property.

392.    Additionally, and/or alternatively, Defendants' decision to delay and the resulting delay in taking effective affirmative action to eliminate, correct, and/or remedy the contamination after having knowledge and notice of said contamination were done with actual malice or recklessly, and in wanton and willful and/or reckless disregard for Plaintiffs' rights, health and property.

393.    Further, Defendants' actions were patently insufficient to eliminate, correct, and/or remedy the contamination after having knowledge and notice of said contamination.

394.    These actions and omissions resulted in the trespass of the Contaminants on the Plaintiffs' properties, thus interfering with the condition of Plaintiffs' property, causing injury and damage to Plaintiffs, their property and their right of possession of their property.

395.    Furthermore, as the State mandated Amended ROD requires installing 24 groundwater extraction wells, five treatment plants, four recharge basins and approximately 24 miles of conveyance piping to contain and treat the contamination, those Plaintiffs who currently reside in

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 59 of 62 PageID #: 83

or near the affected neighborhoods, will suffer the additional nuisance, loss of value, disturbance and damages caused by the above work.

396.    Accordingly, Plaintiffs seek damages from Defendants, in an amount to be determined at trial, in a sufficient amount to compensate them for the injuries and losses sustained, including but not limited physical pain and suffering, physical disabilities, mental anguish, loss of the enjoyment of life's pleasures, inability to participate in Plaintiffs' usual employment and activities, lost income and lost earning opportunities, medical expenses (past and future), economic loss, loss of companionship, services and support, and other damages which are the natural and proximate result of Defendants' conduct.

397.    In addition, those Plaintiffs who are current property owners in the area of the contaminant plumes seek nominal and general damages directly flowing from the trespass, including, but not limited to the difference between the current value of their property and such value if the harm had not been done and the cost of repair or restoration.


## PUNITIVE DAMAGES

398.    Plaintiffs re-allege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

399.    Upon information and belief, Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing personal injuries, property damage, nuisances, and trespasses, disregarding the health and property rights of Plaintiffs.

400.    Defendants' tortious conduct includes but is not limited to:

a. Knowingly and recklessly discharging Contaminants at the Site, knowing that they would enter the air, groundwater and other media and contaminate neighboring properties;

56

b. Issuing no warning to Plaintiffs concerning the release of Contaminants from the Site, in the vicinity of Plaintiffs' real property;

c. Knowing but failing to disclose to Plaintiffs the certainty of long-lasting soil, air, and water contamination at the Site, the Park, and nearby residential areas, including Plaintiffs' residences; and

d. Failing to appropriately remediate the contamination after the Contaminants were detected, causing the contamination to persist and spread for decades.

401.    Defendants have caused great harm to Plaintiffs' person, property, water supplies, indoor and outdoor air, and demonstrated an outrageous conscious disregard for Plaintiffs' safety with implied malice, warranting the imposition of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants NORTHROP GRUMMAN CORPORATION and NORTHROP GRUMMAN SYSTEMS CORPORATION for each and every cause of action alleged herein, granting Plaintiffs compensatory and punitive damages, including all current and future costs and expenses associated with their injuries and damages, together with the costs and disbursements of this action, and state that the amounts sought herein exceed the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims asserted in this Verified Complaint.

Dated: Melville, New York
        February 17, 2022

FILED: NASSAU COUNTY CLERK 02/17/2022 10:54 AM
INDEX NO. 602063/2022

NYSCEF DOC. NO. 1
Case 2:22-cv-01432-GRB-AYS   Document 1-1   Filed 03/15/22   Page 61 of 62 PageID #: 85
RECEIVED NYSCEF: 02/17/2022

NAPOLI SHKOLNIK
*Attorneys for Plaintiffs*

_____

Lilia Factor, Esq.
400 Broadhollow Rd., Suite 305
Melville, New York 11747
Tel. (212) 397-1000

Paul Napoli, Esq.
270 Munoz Rivera Avenue, Ste. 201
Hato Rey, Puerto Rico 00918
Tel. (787) 493-5088

ENVIRONMENTAL LITIGATION GROUP, PC
Gregory A. Cade, Esq. [*pro hac vice to be filed*]
Gary Anderson, Esq.   [*pro hac vice to be filed*]
Kevin B. McKie, Esq. [*pro hac vice to be filed*]
2160 Highland Avenue South
Birmingham, AL 35205
(205) 328-9200

58

Case 2:22-cv-01432-GRB-AYS    Document 1-1    Filed 03/15/22    Page 62 of 62 PageID #: 86

## VERIFICATION

I, Lilia Factor**,** am an attorney duly admitted to practice law in the Courts of this State, and I affirm the following under penalties of perjury:

I am the attorney for the Plaintiffs in the above-entitled action. I have read the foregoing **SUMMONS and COMPLAINT** and know the contents thereof, and upon information and belief, affirmant believes after an inquiry reasonable under the circumstances, the matters alleged herein to be true, and that the contentions herein are not frivolous, as that term is defined in 22 NYCRR § 130-1.1(c).

The reason this verification is made by affirmant and not by Plaintiffs is that the Plaintiffs herein reside in a County other than the County in which I maintain my offices.

The source of affirmant's information and the grounds of his/her belief are communications, papers, reports and investigations contained in the file maintained by this office.

Dated: Melville, New York
        February 17, 2022

_____
LILIA FACTOR

59